UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

THELMA BENOIT, *et al.*,

          Plaintiffs,

   -against-                               1:16-CV-930 (LEK/DJS)

SAINT-GOBAIN PERFORMANCE
PLASTICS CORP., *et al.*,

          Defendants.
_____

CHRISTINE JENSEN, *et al.*,

          Plaintiffs,

   -against-                               1:16-CV-932 (LEK/DJS)

SAINT-GOBAIN PERFORMANCE
PLASTICS CORP., *et al.*,

          Defendants.
_____

DOUGLAS HOLMSTEDT, *et al.*,

          Plaintiffs,

   -against-                               1:16-CV-933 (LEK/DJS)

SAINT-GOBAIN PERFORMANCE
PLASTICS CORP., *et al.*,

          Defendants.
_____

BEVERLY WHITE, *et al.*,

      Plaintiffs,

  -against-          1:16-CV-934 (LEK/DJS)

SAINT-GOBAIN PERFORMANCE
PLASTICS CORP., *et al.*,

      Defendants.

ARNOLD BULLINGER, *et al.*,

      Plaintiffs,

  -against-          1:16-CV-954 (LEK/DJS)

SAINT-GOBAIN PERFORMANCE
PLASTICS CORP., *et al.*,

      Defendants.

RANDALL PUTNAM,

      Plaintiff,

  -against-          1:16-CV-955 (LEK/DJS)

SAINT-GOBAIN PERFORMANCE
PLASTICS CORP., *et al.*,

      Defendants.

PATRICIA ORMSBEE,

                Plaintiff,

    -against-                              1:16-CV-949 (LEK/DJS)

SAINT-GOBAIN PERFORMANCE
PLASTICS CORP., *et al.*,

                Defendants.

DOUGLAS SMITH,

                Plaintiff,

    -against-                              1:16-CV-952 (LEK/DJS)

SAINT-GOBAIN PERFORMANCE
PLASTICS CORP., *et al.*,

                Defendants.

CHERYL RIOS, *et al.*,

                Plaintiffs,

    -against-                              1:16-CV-959 (LEK/DJS)

SAINT-GOBAIN PERFORMANCE
PLASTICS CORP., *et al.*,

                Defendants.

EDWARD FROMMER,

 Plaintiff,

 -against-

SAINT-GOBAIN PERFORMANCE
PLASTICS CORP., *et al.*,

 Defendants.

1:16-CV-1063 (LEK/DJS)

JANET VAN DER KAR,

 Plaintiff,

 -against-

SAINT-GOBAIN PERFORMANCE
PLASTICS CORP., *et al.*,

 Defendants.

1:16-CV-1061 (LEK/DJS)

SUZANNE I. BAKER,

 Plaintiff,

 -against-

SAINT-GOBAIN PERFORMANCE
PLASTICS CORP., *et al.*,

 Defendants.

1:16-CV-1066 (LEK/DJS)

KENNETH CROSS II, *et al.*,

                              Plaintiffs,

    -against-                                    1:16-CV-1060 (LEK/DJS)

SAINT-GOBAIN PERFORMANCE
PLASTICS CORP., *et al.*,

                              Defendants.

MARTHA CAMPBELL,

                              Plaintiff,

    -against-                                    1:16-CV-1057 (LEK/DJS)

SAINT-GOBAIN PERFORMANCE
PLASTICS CORP., *et al.*,

                              Defendants.

STEVEN CHURCH, *et al.*,

                              Plaintiffs,

    -against-                                    1:16-CV-1058 (LEK/DJS)

SAINT-GOBAIN PERFORMANCE
PLASTICS CORP., *et al.*,

                              Defendants.

CYNTHIA BODENSTAB, *et al.*,

                    Plaintiffs,

-against-                                    1:16-CV-1367 (LEK/DJS)

SAINT-GOBAIN PERFORMANCE
PLASTICS CORP., *et al.*,

                    Defendants.

## MEMORANDUM-DECISION AND ORDER

### I.    INTRODUCTION

These sixteen consolidated cases[1] stem from the contamination of groundwater with

perfluorooctanoic acid, or PFOA, in the Village of Hoosick Falls, New York. E.g., Dkt. No. 1

("Complaint") ¶ 1. In their individual complaints, Plaintiffs allege that defendants Saint-Gobain

Performance Plastics Corp. and Honeywell International Inc. contaminated the Village's

groundwater by discharging PFOA from one or more manufacturing facilities they operated

within the Village. E.g., Compl. ¶¶ 34–80. Because of this groundwater contamination, Plaintiffs

---

[1] The sixteen individual cases are Benoit v. Saint-Gobain Performance Plastics Corp.,
No. 16-CV-930; Jensen v. Saint-Gobain Performance Plastics Corp., No. 16-CV-932; Holmstedt
v. Saint-Gobain Performance Plastics Corp., No. 16-CV-933; White v. Saint-Gobain
Performance Plastics Corp., No. 16-CV-934; Ormsbee v. Saint-Gobain Performance Plastics
Corp., No. 16-CV-949; Smith v. Saint-Gobain Performance Plastics Corp., No. 16-CV-952;
Bullinger v. Saint-Gobain Performance Plastics Corp., No. 16-CV-954; Putnam v. Saint-Gobain
Performance Plastics Corp., No. 16-CV-955; Rios v. Saint-Gobain Performance Plastics Corp.,
No. 16-CV-959;  Campbell v. Saint-Gobain Performance Plastics Corp., No. 16-CV-1057;
Church v. Saint-Gobain Performance Plastics Corp., No. 16-CV-1058; Cross v. Saint-Gobain
Performance Plastics Corp., No. 16-CV-1060; Van Der Kar v. Saint-Gobain Performance
Plastics Corp., No. 16-CV-1061; Frommer v. Saint-Gobain Performance Plastics Corp., No. 16-
CV-1063; Baker v. Saint-Gobain Performance Plastics Corp., No. 16-CV-1066; and Bodenstab
v. Saint-Gobain Performance Plastics Corp., No. 16-CV-1367. These cases raise substantially
similar legal issues and, pursuant to the Court's November 29, 2016 order, Dkt. No. 20
("Consolidation Order"), have been combined for the purpose of Defendants' motion to dismiss,
Dkt. No. 21 ("Motion").

claim that the drinking water of Hoosick Falls became nonpotable, causing loss of property value

and other damages. E.g., id. ¶¶ 59, 74–77, 104–05. Additionally, Plaintiffs allege that

consumption of contaminated water has caused PFOA to accumulate in Plaintiffs' blood serum

and bodies. E.g., id. ¶¶ 8–9. A number suits concerning this contamination have been filed in this

district, including a putative class action on behalf of all Village residents, as well as individuals

who drank contaminated water and exhibit a heightened blood-serum level of PFOA. Baker v.

Saint-Gobain Performance Plastics Corp., No. 16-CV-917 (N.D.N.Y.) (Kahn, J.).

Currently before the Court is Defendants' consolidated motion to dismiss for failure to

state a claim. Mot.; see also Dkt. No. 21-2 ("Memorandum"). Plaintiffs filed a consolidated

opposition, Dkt. No. 28 ("Opposition"), and Defendants submitted a Reply, Dkt. No. 29

("Reply"). For the following reasons, Defendants' Motion is granted in part and denied in part.

## II.    BACKGROUND

The following facts are taken from the allegations in the Complaint,[2] which are assumed

to be true when deciding a motion to dismiss for failure to state a claim. Bryant v. N.Y. State

Educ. Dep't, 692 F.3d 202, 210 (2d Cir. 2012).

### A. PFOA

PFOA is a man-made chemical "that belongs to a group of fluorine-containing

chemicals . . . used to make household and commercial products that resist heat and chemical

reactions, and repel oil, stains, grease, and water." Compl. ¶ 21. Originally manufactured by the

---

[2] The parties agree that the individual complaints largely allege the same facts. See Mem. at 2 n.4 ("Aside from allegations specific to the individual Plaintiffs, the Complaints are largely identical."); Opp. at 3 n.2 ("The Actions contain identical factual allegations."). Therefore, for ease of reference, citations to the Complaint are references to the Benoit action, No. 16-CV-930, unless otherwise stated. References to the individual complaints in the other actions are in the form "[Lead Party Name] Complaint ¶ __."

3M Company, PFOA has been "widely used in nonstick cookware, in surface coatings for stain-resistant carpets and fabric, and in paper and cardboard food packaging (such as microwave popcorn bags and fast food containers)." Id. ¶¶ 22–23.

"PFOA can remain in the environment, particularly in water, for many years [and] can move through soil and into groundwater, or be carried in air." Id. ¶ 30. The chemical "is readily absorbed after consumption or inhalation, and it accumulates primarily in the blood stream, kidney and liver." Id. ¶ 26. Plaintiffs claim that PFOA "pose[s] potential adverse effects to human health and the environment," id. ¶ 33, and note that

> [h]uman studies show associations between increased PFOA levels in blood and an increased risk of several health effects, including effects on the liver, the immune system, high cholesterol levels, increased risk of high blood pressure, changes in thyroid hormone, ulcerative colitis (autoimmune disease), pre-eclampsia (a complication of pregnancy that includes high blood pressure), and kidney and testicular cancer,

id. ¶ 31. These health conditions "can arise months or years after exposure to PFOA." Id. ¶ 32.

Plaintiffs cite no studies and make no allegations concerning the dose dependency of these conditions or the threshold levels of exposure associated with them, but do note that the U.S. Environmental Protection Agency ("EPA") recently issued a health advisory for drinking water of seventy parts per trillion (or ppt). Id. ¶ 28. The health advisory level (70 ppt) suggests that individuals should avoid ingesting drinking-water with greater levels of PFOA and is based on the EPA's "assessment of the best available peer-reviewed science." Id.

### B. The Contamination of Hoosick Falls

Hoosick Falls is a village in upstate New York with approximately 4,500 residents. Id. ¶¶ 1, 49. Since at least the late 1960s, manufacturing facilities in and around the Village have

3

used PFOA. Id. ¶¶ 37, 39. Plaintiffs allege that a small factory at 14 McCaffrey Street is the primary source of Hoosick Falls's PFOA contamination. Id. ¶¶ 2, 47. In 1986, the McCaffrey Street facility came to be owned by AlliedSignal, which later adopted Honeywell's name after a merger. Id. ¶¶ 18, 35. In 1996, Honeywell sold the facility to a company called Furon, which was acquired by Saint-Gobain in 1999. Id. ¶ 35. Saint-Gobain owns the facility to this day. Id. ¶ 36.

Defendants manufactured water- and stain-resistant fabric at the McCaffrey Street site, applying a PFOA solution to the fabric in large trays. Id. ¶¶ 37–40. Defendants' employees recovered most of this solution at the end of each shift. Id. ¶ 40. However, employees also washed the trays and poured the resulting discharge down floor drains in the facility. Id. ¶ 41. As a result of this practice, PFOA flowed into the soil and ultimately the aquifer. Id.

Saint-Gobain and Honeywell also used solid PFOA to manufacture Teflon-coated materials and other products in large ovens at the McCaffrey Street site. Id. ¶¶ 44–46. In connection with this activity, Defendants' employees again discharged PFOA down storm drains, causing it to migrate into the soil and aquifer. Id. ¶ 47. The Complaint also alleges that Defendants "discharged PFOA into the environment in other ways." Id. ¶ 48.

Approximately 95% of Hoosick Falls residents receive drinking water from the Village's municipal water system, which gathers its water from three wells. Id. ¶¶ 49–50. Other residents receive drinking water from private wells. Id. ¶ 53.

In 2014 and 2015, the Village conducted several tests showing high levels of PFOA in its municipal wells. Id. ¶¶ 51–58. These tests showed PFOA concentrations ranging from 150 to 662 ppt. Id. ¶ 52. As noted above, the EPA has advised against using water supplies with concentrations greater than 70 ppt. Id. ¶¶ 28, 55. Tests of private wells revealed PFOA

4

concentrations "as high as 412 [ppt]." Id. ¶ 53. Groundwater wells near the McCaffrey Street facility "tested as high as 18,000 [ppt]." Id. ¶ 54.

In November 2015, the EPA Region 2 Administrator recommended that Hoosick Falls residents use an alternative water source rather than drinking contaminated groundwater. Id. ¶ 58. Apparently, the Village did not heed this warning because the EPA repeated its recommendation on December 17, 2015. Id. ¶ 62. Shortly thereafter, Saint-Gobain began to provide free bottled water to Village residents and agreed to fund the installation of a filter system on the municipal supply. Id. ¶ 63.

On January 14, 2016, the New York Department of Environmental Conservation ("DEC") requested that the EPA investigate the origin of the contamination and add Hoosick Falls to the National Priorities List under the federal Superfund program. Id. ¶ 64. On January 27, 2016, Governor Andrew Cuomo announced that the McCaffrey Street facility would be classified as a state Superfund site, and that the State was classifying PFOA as a hazardous substance. Id. ¶ 66. In February 2016, the DEC identified Defendants as the parties responsible for the Village's PFOA contamination. Id. ¶ 67. In June 2016, Defendants entered into two consent orders with the DEC. Id. ¶ 79. The consent orders required Defendants to investigate the causes and scope of the contamination, identify a feasible alternative water supply for the Village, fund the installation of municipal filtration systems, and provide bottled water to residents until the filtrations systems were installed. Id.

The PFOA contamination has had additional effects on homeowners in Hoosick Falls. As alleged in the Complaint, "[t]he water contamination in Hoosick Falls has made properties in the area less marketable and resulted in significant property devaluation." Id. ¶ 75. Homeowners

5

have also faced difficulty obtaining financing because banks have "cut back and/or cease[d]
mortgage and refinancing activities in and around Hoosick Falls for fear of future property
devaluation and/or the lack of access to potable water." Id. ¶ 76.

As discussed further below, not all plaintiffs allege current manifestation of disease or
symptoms related to PFOA exposure, but Plaintiffs note that "no medical studies have been done
in Hoosick Falls regarding the PFOA contamination." Id. ¶ 61.

### C. Plaintiffs' Injuries

The individual complaints allege two main sources of harm: damage to the Plaintiffs'
property and personal injury from their ingestion of PFOA. Both are discussed in turn below.

#### 1. Property Damage

As a part of the injury alleged for Plaintiffs' negligence, trespass, strict liability, and
nuisance claims, Plaintiffs argue that the PFOA pollution caused harm to real property they either
own or rent. Id. ¶¶ 104, 108, 121, 130–31, 139. Throughout the Complaint, the uniform source of
this harm is the contamination of the drinking water in Hoosick Falls, either through the
municipal water supply or through private wells on their land. E.g., id. ¶¶ 100–01, 115–16,
125–26, 135–38. Plaintiffs' alleged damages include the cost to remediate the contamination of
their property, the loss of their use and enjoyment of the property, and a loss in their quality of
life. E.g., id. ¶ 108.

Perhaps the largest source of damages is an alleged loss in Plaintiffs' property values.
E.g., id. ¶ 121. As noted earlier, Plaintiffs allege that PFOA contamination "has made properties
in the area less marketable and resulted in significant property devaluation." Id. ¶ 75. The
individual complaints seek monetary damages to compensate Plaintiffs for "the difference

between the current value of their property and such value if the harm had not been done." Id.

¶ 108. Of course, these damages are applicable only to those plaintiffs who own real property in

Hoosick Falls. For ease of reference, the plaintiffs who own their own homes are Thelma and

David Benoit, id. ¶ 7, Christine and James Jensen, Jensen Compl. ¶ 7, Douglas and Debra

Holmstedt, Holmstedt Compl. ¶ 7, Beverly and Roger White, White Compl. ¶ 7, Randall

Putnam, Putnam Compl. ¶ 7, Patricia Ormsbee, Ormsbee Compl. ¶ 7, Douglas Smith, Smith

Compl. ¶ 7, Cheryl and Robert Rios, Rios Compl. ¶ 7, Janet Van Der Kar, Van Der Kar Compl.

¶ 60, Edward Frommer, Frommer Compl. ¶ 7, Suzanne Baker, Baker Compl. ¶ 7, Kenneth

Cross II and Ceilo Cross, Cross Compl. ¶ 7, Martha Campbell, Campbell Compl. ¶ 7, Mary

Schmigel, Bryan Schrom, Kary Schrom, and Margaret Sargood, Bodenstab Compl. ¶¶ 10, 16, 22

("Property Owner Plaintiffs"), and the plaintiffs who rent are Arnold Bullinger, Travis Conquest,

Bullinger Compl. ¶¶ 7, 10, Steven and Sharon Church, Church Compl. ¶¶ 7, 10, and Cynthia

Bodenstab, Bodenstab Compl. ¶ 7 ("Renter Plaintiffs").[3]

It is also important to distinguish between plaintiffs who use the Village's municipal

water supply and those who utilize private wells. As explained below, whether a plaintiff uses

the municipal supply will determine whether they have adequately pleaded certain claims. For

ease of reference, the plaintiffs who receive water from the municipal water supply are Douglas

---

[3] Several plaintiffs do not fall into either the homeowner or renter group. Plaintiff
Michael Schmigel lives with his mother, Mary, who owns her home. Bodenstab Compl. ¶ 13.
Plaintiffs Kevin Schrom and Nickolas Schrom reside with Bryan and Kary Schrom, also
homeowners, but it is unclear what relationship exists between the Schrom plaintiffs. Id.
¶¶ 16–20. No allegation is made as to whether Lisa Tifft, Ruth Tifft, or Brett Ferraro are
homeowners or renters. Id. ¶¶ 27, 28; Bullinger Compl. ¶¶ 7, 10, 66. Because these plaintiffs do
not allege any ownership interest in their residences, the Court considers them to be among the
Renter Plaintiffs.

and Debra Holmstedt, Holmstedt Compl. ¶ 7, Beverly and Roger White, White Compl. ¶ 7,

Arnold Bullinger, Travis Conquest, Brett Ferraro, Bullinger Compl. ¶¶ 7, 10, 66, Randall

Putnam, Putnam Compl. ¶ 7, Patricia Ormsbee, Ormsbee Compl. ¶ 7, Douglas Smith, Smith

Compl. ¶ 7, Cheryl and Robert Rios, Rios Compl. ¶ 7, Janet Van Der Kar, Van Der Kar Compl.

¶ 60, Edward Frommer, Frommer Compl. ¶ 7, Suzanne Baker, Baker Compl. ¶ 7, Kenneth Cross

II and Ceilo Cross (individually and on behalf of their child, R.D.C.), Cross Compl. ¶ 7, Martha

Campbell, Campbell Compl. ¶ 7, Steven and Sharon Church, Church Compl. ¶¶ 7, 10, Cynthia

Bodenstab, Mary Schmigel, Michael Schmigel, Bryan Schrom, Kary Schrom, Kevin Schrom,

Nickolas Schrom, Margaret Sargood, Lisa Tifft, and Ruth Tifft, Bodenstab Compl. ¶¶ 7, 10, 13,

16, 22, 25, 28 (collectively, the "Municipal Water Plaintiffs"), and the plaintiffs with private

wells are Thelma and David Benoit, Compl. ¶ 7, and Christine and James Jensen, Jensen Compl.

¶ 7 (collectively, the "Private Well Plaintiffs").

### 2. *Personal Injury*

Plaintiffs also seek relief stemming from their consumption of the PFOA-contaminated

water. According to the Complaint, Plaintiffs have "been exposed to high levels of PFOA," an

exposure that resulted in "elevated levels of PFOA in [their] blood," placing them "at an

increased risk of several health effects, including but not limited to effects on the liver and

immune system, high cholesterol levels, changes in thyroid hormone, and kidney and testicular

cancer." Compl. ¶ 9. Plaintiffs combine this allegation with claims that PFOA is associated with

increased risk of several cancers and other diseases, noting advised limits on PFOA exposure

established by regulators. Id. ¶¶ 28–33. In response to this risk, Plaintiffs seek consequential

damages and injunctive relief to either fund or provide medical monitoring. Id. ¶ 108.[4]

Not every plaintiff claims an increased level of PFOA in her blood. The plaintiffs who

allege heightened blood-serum levels of PFOA are Thelma and David Benoit, Compl. ¶¶ 8–9,

Christine and James Jensen, Jensen Compl. ¶¶ 8–9, Douglas and Debra Holmstedt, Holmstedt

Compl. ¶¶ 8–9, Beverly and Roger White, White Compl. ¶¶ 8–9, Patricia Ormsbee, Ormsbee

Compl. ¶ 8, Arnold Bullinger, Travis Conquest, Brett Ferraro, Bullinger Compl. ¶¶ 7, 10, 14,

Cheryl and Robert Rios, Rios Compl. ¶ 8–9, Steven and Sharon Church, Church Compl. ¶¶ 8, 11,

Kenneth Cross II and Ceilo Cross (individually and on behalf of their child, R.D.C.), Cross

Compl. ¶ 8, 10, 12, Janet Van Der Kar, Van Der Kar Compl. ¶ 8, Suzanne Baker, Baker Compl.

¶ 8, Cynthia Bodenstab, Mary Schmigel, Michael Schmigel,  Bryan Schrom, Kary Schrom,

Kevin Schrom, Nickolas Schrom, Margaret Sargood, Lisa Tifft, and Ruth Tifft, Bodenstab

Compl. ¶¶ 8, 11, 14, 17–20, 23, 26, 29 (collectively, the "Accumulation Plaintiffs"). On the other

---

[4] Medical monitoring or biomonitoring is the provision of "regular medical testing . . .
intended to detect the onset of latent injuries or diseases and to facilitate early diagnosis and
treatment." Abbatiello v. Monsanto Co., 522 F. Supp. 2d 524, 536 (S.D.N.Y. 2007), abrogated in
part by Caronia v. Philip Morris USA, Inc., 5 N.E.3d 11 (N.Y. 2013); see also Chistopher P.
Guzelian et al., A Quantitative Methodology for Determining the Need for Exposure-Prompted
Medical Monitoring, 79 Ind. L.J. 57, 58 (2004) (defining medical monitoring as "periodic
diagnostic medical examinations and medical tests intended to diagnose illness or medical
conditions before they would be diagnosed in the course of ordinary medical care"). "The object
of [medical] monitoring is to find a disease before symptoms arise that would prompt the patient
to seek medical care resulting in a typical clinical diagnosis," allowing earlier treatment when
swift intervention would allow for better outcomes. Guzelian et al., supra, at 64, 76–77; see also
ATSDR's Final Criteria for Determining the Appropriateness of a Medical Monitoring Program
Under CERCLA, 60 Fed. Reg. 38,840, 38,841–42 (July 28, 1995) ("[Medical] monitoring should
be directed at detecting adverse health effects that are . . . amenable to prevention or intervention
measures. . . . [T]he adverse health effects . . . should be such that early detection and treatment
or intervention interrupts the progress to symptomatic disease, improves the prognosis of the
disease, improves the quality of life of the individual, or is amenable to primary prevention.").

hand, Douglas Smith, Smith Compl. ¶ 8, Randall Putnam, Putnam Compl. ¶ 8, Martha Campbell,

Campbell Compl. ¶ 8, and Edward Frommer, Frommer Compl. ¶ 8 (collectively, the

"Nonaccumulation Plaintiffs") do not allege any heightened blood concentration of PFOA.

Importantly, several plaintiffs allege to suffer from diseases or symptoms they claim were

caused by PFOA exposure. Plaintiffs Douglas and Debra Holmstedt have high blood pressure.

Holmstedt Compl. ¶¶ 8–9. Beverly White "suffers from kidney problems [and] high cholesterol."

White Compl. ¶ 8. Douglas Smith has "high blood pressure requiring him to take medication."

Smith Compl. ¶ 8. Arnold Bullinger "has been diagnosed with guttate psoriasis, has kidney

problems, high blood pressure, high cholesterol." Bullinger Compl. ¶ 8. Edward Frommer has

kidney disease and high cholesterol and blood pressure. Frommer Compl. ¶ 8. Suzanne Baker has

been diagnosed with cancer. Compl. ¶ 8. Finally, Cynthia Bobenstab, Mary and Michael

Schmigel, Bryan Schrom, and Margaret Sargood each have high blood pressure, while Michael

Schmigel and Bryan Schrom also suffer from high cholesterol, and Mary Schmigel and Margaret

Sargood have high cholesterol and thyroid disease. Bodenstab Compl. ¶¶ 8, 11, 14, 17, 23. These

plaintiffs are referred to as the "Symptomatic Plaintiffs."[5]

**D. Defendants' Motion**

After the sixteen individual complaints were filed, Saint-Gobain and Honeywell moved to

dismiss each for failure to state a claim. Mot. The core of Defendants' argument is that Plaintiffs

have not suffered a legally cognizable injury—either to their property or to their

bodies—sufficient to allege a tort under New York law. Mem. at 5–16.

---

[5] Plaintiff Randall Putnam "suffers from brain cancer." Putnam Compl. ¶ 8. However, he does not allege that brain cancer is associated with PFOA exposure. Nor does he allege an increased level of PFOA in his blood.

First, Defendants argue that claims for economic injury alone—here, a loss in property

value—are not allowed under New York law. Id. at 6–8. Defendants claim that all of Plaintiffs'

property damage claims are based on injury to groundwater, but because groundwater in New

York is "a natural resource entrusted to the state by and for its citizens," Plaintiffs lack standing

to sue and cannot claim a cognizable injury to their own property. Id. at 8–9. Moreover, eleven

Plaintiffs "do not allege *any* impact on their property whatsoever and do not purport to seek relief

in the form of property damage, likely because [these] Plaintiffs do not own any property." Id.

at 9.

Next, Defendants argue that "the vast majority" of Plaintiffs fail to adequately allege

personal injury because the harm complained of—an increased risk of illness—is not a "presently

existing physical injury" cognizable under New York law. Id. at 10–15. Defendants assert that

several Plaintiffs who do allege medical conditions or ailments do not actually allege that those

injuries were caused by PFOA exposure. Id. at 15–16.

Finally, Defendants argue that Plaintiffs' nuisance claims fail as a matter of law because

the injury alleged is common across thousands of people, yet a private nuisance must "threaten[]

one person or a relatively few." Id. at 16 (emphasis omitted) (quoting Caldarola v. Town of

Smithtown, No. 09-CV-272, 2010 WL 6442698, at *15 (E.D.N.Y. July 14, 2010), adopted by

2010 WL 1336574 (E.D.N.Y. Apr. 4, 2011)). Additionally, those Plaintiffs who fail to allege that

they own or rent their residences lack standing to state a private nuisance claim. Id. at 17.

III.    LEGAL STANDARD

To survive a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the

Federal Rules of Civil Procedure, a "complaint must contain sufficient factual matter, accepted as

11

true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A court must accept as true the factual allegations contained in a complaint and draw all inferences in favor of the plaintiff. Allaire Corp. v. Okumus, 433 F.3d 248, 249–50 (2d Cir. 2006). Plausibility, however, requires "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the alleged misconduct]." Twombly, 550 U.S. at 556.

The plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556). "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Id. (quoting Twombly, 550 U.S. at 555). Where a court is unable to infer more than the mere possibility of the alleged misconduct based on the pleaded facts, the pleader has not demonstrated that she is entitled to relief and the action is subject to dismissal. Id. at 678–79.

## IV.    DISCUSSION

Many of Defendants' arguments were directly addressed in the Court's decision in Baker v. Saint-Gobain Performance Plastics Corp., No. 16-CV-917, 2017 WL 486939 (N.D.N.Y. Feb. 6, 2017) (Kahn, J.), which concerns a putative class action stemming from the same contamination Plaintiffs challenge. As explained below, that decision controls many of the questions raised by Defendants' Motion.

### A.  Negligence and Strict Liability

The well-known elements of negligence under New York law are duty, breach, causation, and injury. E.g., Aegis Ins. Servs., Inc. v. 7 World Trade Co., 737 F.3d 166, 177 (2d Cir. 2013);

12

Pasternack v. Lab. Corp. of Am. Holdings, 59 N.E.3d 485, 490 (N.Y. 2016). In moving to

dismiss, Defendants primarily focus on the injury prong. They argue that Plaintiffs fail to allege a

cognizable injury to property, and thus, the negligence and strict liability claims must be

dismissed. Mem. at 5–10. Similarly, because "the vast majority" of Plaintiffs fail to adequately

allege a "presently existing physical injury" caused by the PFOA contamination, the personal

injury theory also fails. Id. at 10–15.

### 1. *Property Damage*

In support of Plaintiffs' negligence claim, they argue that Honeywell and Saint-Gobain

knew or should have known that "exposure to PFOA was hazardous to the environment and

human health," that Defendants' method of disposal caused it to enter the environment and

ultimately Plaintiffs' water supply, and that such actions together were unreasonable and

negligent. Compl. ¶¶ 93–105. As an alternative theory, Plaintiffs argue that Defendants'

manufacture and handling of PFOA constituted an abnormally dangerous activity, and thus that

Honeywell and Saint-Gobain may instead be held strictly liable. Id. ¶¶ 122–131.[6] Plaintiffs'

property-related damages include the loss in their property value, the expense of remediation, the

loss of their use and enjoyment of the property, and a decline in their quality of life. Id. ¶ 108. All

Plaintiffs allege property damages, but the eleven Renter Plaintiffs do not allege any ownership

interest in their residences. It is well established that a plaintiff cannot recover for damage to

property he does not own. See, e.g., 36 N.Y. Jur. 2d § 2 ("To warrant a recovery of damages, the

---

[6] Defendants do not argue in the Motion that their alleged activities were not abnormally
dangerous, Mem., a question left for later resolution in this case. Accordingly, while the
discussion here is primarily phrased in terms of negligence, these issues are applicable to both
theories of liability.

plaintiff must establish an invasion of some legal right of his or hers by a wrongful act on the part

of the defendant, resulting in loss or damage to the plaintiff."). Therefore, to the extent the Renter

Plaintiffs allege damage to real property, those claims are dismissed.

According to Defendants, Plaintiffs' core complaint concerns contamination of the

Village's groundwater. Mem. at 5–6. While this groundwater constituted the source of Plaintiffs'

drinking water (either through the municipal water supply or private wells), under New York

law, Plaintiffs themselves do not own this groundwater. Id. at 8–9. Thus, because what was

injured—the aquifer—is not Plaintiffs' property, they did not suffer an injury sufficient to raise a

negligence claim, which Defendants argue requires a physical injury to their property. Id.

In support of this view, Defendants point to Ivory v. International Business Machines

Corp., 983 N.Y.S.2d 110, 117 (App. Div. 2014), in which the Third Department discussed the

availability of trespass claims based on groundwater contamination. While the court ultimately

allowed the trespass claims because the groundwater "apparently flowed through [and

contaminated] the soil under the [plaintiffs'] homes," it noted that contamination of groundwater

alone cannot support a trespass claim. Id. This was because "groundwater does not belong to the

owners of real property, but is a natural resource entrusted to the state by and for its citizens." Id.

Defendants made a nearly identical argument in Baker, which the Court rejected. 2017

WL 486939, at *7–8. Defendants' argument fails here for the reasons it did there. As the Court

explained in Baker,

> There are two important differences between Ivory and this case.
> First, the quote from Ivory relied on by Defendants concerned a
> trespass claim, and not a negligence claim. Id. Second, while Ivory
> seemed to reject claims based on groundwater contamination alone,
> it did not consider the contamination of the plaintiffs' drinking water

supply (an issue discussed later in connection with the Private Well
Plaintiffs' trespass claims).

Id. at *8 (footnote omitted) (citing Castle Vill. Owners Corp. v. Greater N.Y. Mut. Ins. Co., 878

N.Y.S.2d 311, 315 (App. Div. 2009); State v. N.Y. Cent. Mut. Fire Ins. Co., 542 N.Y.S.2d 402,

403–04 (App. Div. 1989)).

In fact, Ivory appears to hold the opposite of what Defendants argue, and suggests that

groundwater contamination is a cognizable injury under New York law. In affirming the trial

court's decision denying summary judgment on the plaintiffs' negligence claim, the Third

Department explained, "[i]n cases involving the pollution of underground waters, the plaintiff

must demonstrate that the defendant failed to exercise due care in conducting the allegedly

polluting activity." Ivory, 983 N.Y.S.2d at 114–15 (quoting Fetter v. DeCamp, 600 N.Y.S.2d

340, 342 (App. Div. 1993)). The court continued: "Although the precise manner in which the

harm occurred need not be foreseeable, liability does not attach unless the harm is within the

class of reasonably foreseeable hazards that the duty exists to prevent." Id. (quoting Sanchez v.

State of N.Y., 784 N.E.2d 675, 678 (N.Y. 2002)).

Additional Appellate Division case law supports this conclusion. The Second Department

has explained that "[i]n cases involving the pollution of underground waters, liability arising

from negligence may be founded only upon a demonstration that the defendant failed to exercise

due care in conducting the allegedly polluting activity, and that he or she knew or should have

known that such conduct could result in contamination." Murphy v. Both, 922 N.Y.S.2d 483, 485

(App. Div. 2011) (citing Strand v. Neglia, 649 N.Y.S.2d 729, 730 (App. Div. 1996); Fetter, 600

N.Y.S.2d at 342). Thus, Ivory and Murphy appear to foreclose Defendants' argument that a negligence claim cannot be premised on groundwater contamination.

Moreover, as explained in Baker, 2017 WL 486939, at *9–10, even assuming Plaintiffs cannot state a negligence claim premised on groundwater contamination, Plaintiffs have sufficiently alleged other property-based injury to avoid dismissal. As they did in Baker, Defendants point to 532 Madison Avenue Gourmet Foods, Inc v. Finlandia Center, Inc., 750 N.E.2d 1097 (N.Y. 2001), to argue that Plaintiffs do not present such an injury. In that case, several shopkeepers and business owners in midtown Manhattan sued after construction collapses blocked access to their buildings. Id. at 1099–1100. The issue was whether the plaintiffs, whose property was not itself damaged by the collapses, could state a claim for negligence in an attempt to recover for lost business and other economic damages. Id. at 1100–01. The New York Court of Appeals found that they could not, and limited recovery to those plaintiffs who "suffered personal injury or property damage" as opposed to those who suffered only a reduction in profits. Id. at 1103. Focusing on this language, Defendants argue that Plaintiffs must allege physical damage to property to state a claim for negligence. Mem. at 5–6 (citing 532 Madison, 750 N.E.2d at 1101).

But by taking this language out of context, Defendants misconstrue 532 Madison. The case turned not on injury, but on duty. As the Court explained in Baker, "532 Madison did not . . . announce a talismanic requirement for plaintiffs to allege physical injury to their property (with courts left to determine what constitutes a physical injury). Instead, the decision concerned the existence of a legal duty between the plaintiffs and defendants." 2017 WL 486939, at *8 (citing 532 Madison, 750 N.E.2d at 1101). The 532 Madison court recognized that "[a]

16

landowner who engages in activities that may cause injury to persons on adjoining premises surely owes those persons a duty to take reasonable precautions to avoid injuring them," but concluded that the expansion of this duty to protect additional shopkeepers who lost profits due to road closures—shopkeepers whose properties were not themselves reached by the collapse—would unreasonably expand the scope of negligence. 750 N.E.2d at 1102–03. In so doing, the court limited the scope of tortfeasors' duty; it did not alter the range of cognizable injuries.

The Court of Appeals in <u>532 Madison</u> described how courts should determine the extent of this duty:

> The existence and scope of a tortfeasor's duty is, of course, a legal question for the courts, which "fix the duty point by balancing factors, including the reasonable expectations of parties and society generally, the proliferation of claims, the likelihood of unlimited or insurer-like liability, disproportionate risk and reparation allocation, and public policies affecting the expansion or limitation of new channels of liability."

<u>Id.</u> at 1101 (quoting <u>Hamilton v. Beretta U.S.A. Corp.</u>, 750 N.E.2d 1055, 1060 (N.Y. 2001)); <u>accord</u> <u>In re September 11 Litig.</u>, 280 F. Supp. 2d 279, 290 (S.D.N.Y. 2003). Such a duty "do[es] *not* rise from mere foreseeability of the harm," <u>Hamilton</u>, 750 N.E.2d at 1062 (citing <u>Pulka v. Edelman</u>, 358 N.E.2d 1019, 1022–23 (N.Y. 1976)), but instead comes from an analysis "of the wrongfulness of a defendant's action or inaction" combined with "an examination of an injured person's reasonable expectation of the care owed," <u>Palka v. Servicemaster Mgmt. Servs. Corp.</u>, 634 N.E.2d 189, 192 (N.Y. 1994) (citing <u>Turcotte v. Fell</u>, 502 N.E.2d 964, 967 (N.Y. 1986)).

In <u>Baker</u>, the Court held that "this policy determination must include a duty not to pollute a plaintiff's drinking water. Society has a reasonable expectation that manufacturers avoid

17

contaminating the surrounding environment, an expectation that extends to the pollution of an area's water supply." 2017 WL 486939, at *9 (collecting cases). "It is sensible public policy to require that manufacturers avoid polluting the drinking water of the surrounding community, and nothing in 532 Madison prevents a person whose water supply was contaminated by such conduct from recovering in tort, even if she seeks economic damages." Id. Under Defendants' view, a manufacturer may freely contaminate the local drinking water supply, thereby depriving neighboring properties of potable water. This position is not supported by New York law and runs counter to society's reasonable expectations. Therefore, Plaintiffs have sufficiently stated a claim for negligence.

Moreover, other courts applying New York law have concluded that loss-of-value damages constitute a sufficient injury in contamination suits when the plaintiff's property is directly affected by the defendant's conduct. What Defendants dismiss as "'stigma damages' have been recognized as a valid category of damages by the New York courts in environmental cases." 87th Street Owners Corp. v. Carnegie Hill–87th Street Corp., 251 F. Supp. 2d 1215, 1223 (S.D.N.Y. 2002); see also Cottonaro v. Southtowns Indus., Inc., 625 N.Y.S.2d 773, 774 (App. Div. 1995) ("Damages from the diminished market value of real property as a result of public fear of exposure to a potential health hazard constitute consequential damages.").

Finally, as explained in Baker, "the nonstigmatic injuries claimed by Plaintiffs provide an independent reason why Plaintiffs' negligence claims survive even under Defendants' interpretations of Ivory and 532 Madison." 2017 WL 486939, at *9. Plaintiffs' central injury is the loss of their potable water supply, e.g., Compl. ¶ 105, "an injury that is not fairly categorized as purely economic in nature." Baker, 2017 WL 486939, at *9. Plaintiffs allege a reduction in

18

property values due to this injury, but they also seek compensatory damages for the cost of remediating the contamination to their property and restoring a long-term potable water supply. E.g., Compl. ¶ 108. Accordingly, Plaintiffs' claims for negligence and strict liability based on property damage survive Defendants' Motion.

## 2. Personal Injury

In addition to property damages, Plaintiffs assert negligence and strict liability claims premised on personal injury. E.g., id. ¶¶ 108, 131. Because PFOA is associated with an increased risk of cancer and other conditions, e.g., id. ¶ 31, the central remedy sought for these injuries is medical monitoring. As noted above, only twelve of the thirty-five plaintiffs allege current manifestation of disease or symptoms associated with PFOA exposure. Of the remaining non-symptomatic plaintiffs, all but two are among the Accumulation Plaintiffs who allege elevated levels of PFOA in their blood. All plaintiffs, those with symptoms and those without, allege Defendants placed them "at an increased risk of several health effects," including cancer. Compl. ¶ 9.

Defendants argue that non-symptomatic plaintiffs are not entitled to medical monitoring damages as a matter of law, pointing to Caronia v. Philip Morris USA, Inc., 5 N.E.3d 11 (N.Y. 2013). Defendants advanced the same argument in Baker. 2017 WL 486939, at *12–15. In that case, the Court rejected Defendants' interpretation of Caronia, id. at *15, and the same result is required here.

In Caronia, the plaintiffs sought medical monitoring for early detection of lung cancer after smoking Marlboro cigarettes, but did not claim to suffer from lung cancer or to be "under investigation by a physician for suspected lung cancer." 5 N.E.3d at 13–14. Answering a certified

19

question from the Second Circuit, the New York Court of Appeals held that there is no independent equitable cause of action for medical monitoring under New York law. Id. at 14. In order to obtain medical monitoring damages, a plaintiff must allege "an already existing tort cause of action," which in turn requires an allegation of existing "physical injury or damage to property." Id. at 16, 18–19.

Defendants interpret Caronia as foreclosing medical monitoring damages absent a present physical injury, which they define as the manifestation of symptoms or disease. Mem. at 10–11. Thus, Defendants argue, Plaintiffs who do not allege any present symptoms cannot state an independent tort, a requirement for medical monitoring damages under New York law. Id.

As explained in Baker, "Defendants' view is incorrect for two reasons." 2017 WL 486939, at *13. First, Caronia does not define physical injury as narrowly as Defendants claim. In fact, a plaintiff may show an injury sufficient to seek medical monitoring damages through the accumulation of a toxic substance within her body. Second, Caronia appears to allow medical monitoring damages even if the only tort with a present "injury" involves harm to property, which, as discussed above, Plaintiffs have sufficiently alleged.[7]

In Caronia, the Court of Appeals favorably cited two Appellate Division cases for the proposition that a "plaintiff [must] sustain a physical injury before he or she may recover consequential damages for medical monitoring." 5 N.E.3d at 16–17 (citing Abusio v. Consolidated Edison Co. of N.Y., 656 N.Y.S.2d 371 (App Div. 1997) (per curiam); Allen v. Gen. Elec. Co., 821 N.Y.S.2d 692 (App. Div. 2006) (per curiam)). In Abusio and Allen, the personal

---

[7] As used in this opinion, medical monitoring refers to a remedy granted after exposure to a toxic substance that provides testing for early detection of the signs of disease, which in turn allows for earlier and more effective treatment. E.g., Abbatiello, 522 F. Supp. 2d at 536.

injury that supported medical monitoring was the "clinically demonstrable presence of [toxins] in the plaintiff's body, or some indication of [toxin]-induced disease, i.e., some physical manifestation of [toxin] contamination." Id. (alterations in original) (quoting Abusio, 656 N.Y.S.2d at 455). The Court held in Baker that "the blood accumulation of PFOA—as alleged by the Accumulation Plaintiffs in this case—is sufficient to permit a claim for negligence seeking medical monitoring damages." 2017 WL 486939, at *14. The Court finds no reason to depart from that holding here, and so Plaintiffs' personal injury claims survive Defendants' Motion.

Finally, as explained in Baker, "even if the accumulation of PFOA in the blood were not enough to constitute an injury within a preexisting tort, Caronia also allows plaintiffs to seek medical monitoring as consequential damages for a tort alleging injury to property." Id. at *15. As discussed above, Plaintiffs have sufficiently alleged claims for negligence and other torts concerning property, which constitute "an already existing tort cause of action," Caronia, 5 N.E.3d at 18–19. Therefore, Plaintiffs cannot be denied medical monitoring damages at this stage.

### B. Trespass

In addition to their negligence and strict liability claims, Plaintiffs also allege a cause of action for trespass. Compl. ¶¶ 109–21. Defendants' argument in regard to the trespass claims is fundamentally the same as their argument on the negligence and strict liability front: Plaintiffs' property was not injured by the PFOA contamination. Mem. at 8–9. As in Baker, 2017 WL 486939, at *10, Defendants rely on Ivory, which held that "groundwater does not belong to the owners of real property, but is a natural resource entrusted to the state by and for its citizens," and thus cannot form the basis of a private trespass claim, 983 N.Y.S.2d at 117. The Court

21

rejected this argument in Baker, but there are important differences between Plaintiffs' claims there and those presently before the Court. In Baker, the trespass claim was brought on behalf of property owners who obtained drinking water from private wells. 2017 WL 486939, at *10. The Court rejected Defendants' motion to dismiss this claim because "New York courts have indicated the availability of a trespass action to remedy the contamination of a plaintiff's private well, demonstrating that it is the possessory interest in the well itself that is invaded." Id. (citing Phillips v. Sun Oil Co., 121 N.E.2d 249, 250–51 (N.Y. 1954); Kiley v. State, 426 N.Y.S.2d 78, 78 (App. Div. 1980) (per curiam)). Here, all plaintiffs, even those who receive water from the municipal water supply, allege trespass.

While the Private Well Plaintiffs adequately state a claim for trespass for the reasons articulated in Baker, id., the same cannot be said of the Municipal Water Plaintiffs. Under Ivory, a trespass claim cannot be premised on groundwater contamination alone. 983 N.Y.S.2d at 117. As explained above, groundwater contamination is not an invasion of property interests under New York law and therefore cannot constitute trespass. It is worth noting that in Ivory, the Appellate Division ultimately sustained the plaintiffs' trespass claims because the groundwater there was the medium through which the contaminant entered the homeowners' soil. Id. Here, Plaintiffs make no such claim, and do not allege soil contamination. Compl. Had they done so, the Municipal Water Plaintiffs' claims might have fared better. Accordingly, Defendants' motion to dismiss the trespass claims is granted with respect to the Municipal Water Plaintiffs and denied with respect to the Private Well Plaintiffs.[8]

---

[8] As explained below, the Court will afford the Municipal Water Plaintiffs an opportunity to amend their complaints to properly allege trespass.

22

## C. Nuisance

With respect to Plaintiffs' private nuisance claim, Defendants argue that the injury

alleged is too widespread to constitute a private nuisance because private nuisance can only be

based on conduct "that 'threatens one person or a relatively few.'" Mem. at 16 (emphasis

omitted) (quoting Caldarola, 2010 WL 6442698, at *15). Thus, "to the extent Plaintiffs allege

that these issues with groundwater impact all residents in Hoosick Falls," they fail to state a

claim for private nuisance and instead allege a public nuisance, for which only the state or one of

its subdivisions has standing to bring suit. Id. at 16–17.

The Court partially accepted this reasoning in Baker, 2017 WL 486939, at *11, and

Plaintiffs concede that the Municipal Water Plaintiffs' nuisance claims are barred by that

decision, Opp. at 14 n.11. But the Court also distinguished between the Baker plaintiffs who

obtained water from the municipal water system and those with private wells. The Court

explained:

> Even a public nuisance can permit a private suit for damages when an
> individual or smaller group "sustains a special loss" that is different
> in kind from the harm suffered by the rest of the community. In this
> way, a private wrong may be distinguished from a common injury to
> the public, and a private right of action is restored. . . . In this case,
> the Municipal Water Plaintiffs cannot state a claim for private
> nuisance, and they have not suffered a unique wrong compared to the
> rest of the community sufficient to sustain a private action for an
> otherwise public nuisance. . . . On the other hand, the Private Well
> Plaintiffs have suffered "a special loss" sufficient to maintain a
> nuisance action.

Baker, 2017 WL 486939, at *11 (citing 532 Madison, 750 N.E.2d at 1104). The Court upheld the

nuisance claims brought by the plaintiffs with private wells because they adequately alleged that

they sustained a "special loss." Id. Specifically, those plaintiffs alleged that well contamination

levels "varie[d] . . . significantly" and that they had installed point-of-entry treatment ("POET")

systems, which would "remain installed for the foreseeable future and . . . require regular

maintenance." Id. at *4, *11.

The Court relied on Baity v. General Electric Co., 927 N.Y.S.2d 492 (App. Div. 2011), to

support its conclusion:

> [I]t is well settled that the seepage of chemical wastes into a public
> water supply constitutes a public nuisance. Nevertheless, "[a] public
> nuisance is actionable by a private person only if it is shown that the
> person suffered special injury beyond that suffered by the community
> at large." We conclude that defendant failed to meet its burden of
> establishing that the contamination of plaintiffs' private water wells
> did not constitute a special injury beyond that suffered by the public
> at large.

Id. at *11–12 (alterations in original) (quoting Baity, 927 N.Y.S.2d at 495–96). The Court finds

that the Private Well Plaintiffs here have adequately alleged a "special loss" to support a claim of

private nuisance under Baity. The Private Well Plaintiffs seek damages for "the costs of repair or

restoration," Compl. ¶ 108, and allege varying levels of private well contamination, id. ¶ 53.

Because the "the costs of repair or restoration" will presumably be different for different

properties and wells, the Private Well Plaintiffs have adequately alleged a private nuisance under

Baity.

While the Municipal Water Plaintiffs' injuries are common to the community so as to

preclude private recovery under a nuisance theory, the Private Well Plaintiffs allege a special

harm that sufficiently differs from that suffered by the rest of the area's population. Thus, the

nuisance claims of the Municipal Water Plaintiffs are dismissed, but the Private Well Plaintiffs'

nuisance claims survive Defendants' Motion.

24

### D. Motion to Amend

Rule 15 of the Federal Rules of Civil Procedure allows a plaintiff to amend his complaint

more than twenty-one days after service of a motion to dismiss "only with the opposing party's

written consent or the court's leave." Fed. R. Civ. P. 15(a)(2). Courts "should freely give leave

when justice so requires." Id. "In the absence of any apparent or declared reason—such as undue

delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies

by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance

of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be

'freely given.'" Foman v. Davis, 371 U.S. 178, 182 (1962); see also Aetna Cas. & Sur. Co. v.

Aniero Concrete Co., 404 F.3d 566, 603–04 (2d Cir. 2005) ("[A] Rule 15(a) motion 'should be

denied only for such reasons as undue delay, bad faith, futility of the amendment, and perhaps

most important, the resulting prejudice to the opposing party." (quoting Richardson Greenshields

Securities, Inc. v. Lau, 825 F.2d 647, 653 n.6 (2d Cir. 1987))); Dunn v. Albany Med. Coll., No.

09-CV-1031, 2010 WL 2326127, at *8 (N.D.N.Y. June 7, 2010) (Kahn, J.) ("Leave to amend a

complaint is not automatic, and a court may deny a motion to amend for good cause 'such as

undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure

deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue

of the allowance of the amendment, futility of amendment, etc.'" (quoting Foman, 371 U.S. at

182)).

Plaintiffs argue that they should be allowed to amend their individual complaints to the

extent the Court finds them to be inadequately pleaded. Opp. at 14–15. "An amendment is

considered futile if the amended pleading fails to state a claim or would be subject to a successful

motion to dismiss on some other basis." Cowles v. Yesford, No. 99-CV-2083, 2001 WL 179928, at *3 (N.D.N.Y. Feb. 22, 2001) (quoting Chan v. Reno, 916 F. Supp. 1289, 1302 (S.D.N.Y. 1996)). Plaintiffs concede that it would be futile for the Municipal Water Plaintiffs to amend their complaints because they cannot state a claim for public nuisance. Opp. at 14 n.11. Similarly, it would be futile for the Renter Plaintiffs to amend their complaints because they do not own the properties for which they seek property damages. However, as discussed above, it is possible for plaintiffs Martha Campbell and Randall Putnam to allege sufficient facts to state a claim for negligence and strict liability related to personal injury. Similarly, it is possible for the Municipal Water Plaintiffs to adequately allege a trespass claim under Ivory if they allege soil contamination or the invasion of some other property interest. 983 N.Y.S.2d at 117. Further, there is no indication that Plaintiffs have unduly delayed or engaged in bad faith, and Defendants do not claim they would be prejudiced if Plaintiffs were to amend their complaints.

The Court therefore finds that justice requires allowing Campbell and Putnam and the Municipal Water Plaintiffs to amend their complaints.

### E. Interlocutory Appeal

28 U.S.C. § 1292 allows the district court, when issuing an otherwise unappealable order, to permit an interlocutory appeal to the appropriate circuit court. Specifically, § 1292(b) states that, when a district judge is "of the opinion that [an interlocutory] order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order." When a denial of a motion to dismiss (or, as in this case, a grant in part and denial in part) "'involves a new legal question or is of special

consequence,' then the district court 'should not hesitate to certify an interlocutory appeal.'"

Balintulo v. Daimler AG, 727 F.3d 174, 186 (2d Cir. 2013) (quoting Mohawk Indus., Inc. v.

Carpenter, 558 U.S. 100, 111 (2009)).

The Court certified an interlocutory appeal under § 1292 in Baker, which involved many

of the same questions of New York law. 2017 WL 486939, at *18. There, the Court explained:

> In this case, where the question of which claims are viable under New
> York law could significantly impact the classes to be certified, the
> scope and focus of discovery, any subsequent motion for summary
> judgment, and the issues to be presented at trial, an early resolution
> of the applicable law could significantly improve the efficiency of this
> litigation and reduce its cost for both Defendants and the putative
> classes. Furthermore, an interlocutory appeal could benefit either or
> both parties, since both sides incurred a partially adverse decision
> through this Memorandum-Decision and Order.

Id. For the same reasons, the requirements of § 1292 are met in this case.

Therefore, the Court certifies this order for interlocutory appeal pursuant to 28 U.S.C.

§ 1292(b). Any party seeking to appeal pursuant to this certification must apply to the Second

Circuit for leave to appeal within ten days of the filing date of this Memorandum-Decision and

Order, and any such appeal will not delay proceedings in this Court absent a stay granted by the

Court of Appeals. § 1292(b).

V.    CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that Defendants' Motion (Dkt. No. 21) is **GRANTED in part and**

**DENIED in part**; and it is further

**ORDERED**, that the Municipal Water Plaintiffs' nuisance claims are **DISMISSED**; and

it is further

**ORDERED**, that the Renter Plaintiffs' negligence and strict liability claims related to property damage are **DISMISSED**; and it is further

**ORDERED**, that the Municipal Water Plaintiffs' trespass claims are **DISMISSED with leave to amend**; and it is further

**ORDERED**, that the Martha Campbell and Randall Putnam's negligence and strict liability claims related to personal injury are **DISMISSED with leave to amend**; and it is further

**ORDERED**, that Plaintiffs' negligence and strict liability claims related to PFOA ingestion, the Property Owner Plaintiffs' negligence and strict liability claims related to property damage, and the Private Well Plaintiffs' trespass and nuisance claims otherwise survive Defendants' Motion; and it is further

**ORDERED**, that the questions of law decided in this Memorandum-Decision and Order are certified for interlocutory appeal pursuant to 28 U.S.C. § 1292(b), and any party may apply for leave to appeal with the United States Court of Appeals for the Second Circuit within **ten days** of the filing date of this Memorandum-Decision and Order;[9] and it is further

**ORDERED**, that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on all parties pursuant to the Local Rules.

---

[9] See also Fed. R. App. P. 5 (providing rules governing petitions for permission to appeal).

**IT IS SO ORDERED.**


DATED:     August 02, 2017

               Albany, New York


Lawrence E. Kahn
U.S. District Judge